**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALVIN HINTZ, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 08-cv-1444 |
| | ) | |
| PRUDENTIAL INSURANCE COMPANY | ) | Judge Robert M. Dow, Jr. |
| OF AMERICA and LONG TERM | ) | |
| DISABILITY COVERAGE FOR | ) | |
| CLASS 1: U.S.-EXECUTIVES OF CCL | ) | |
| CUSTOM MANUFACTURING, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In several recent rulings, the Seventh Circuit has emphasized that district court *de novo* review of benefits denials under the Employee Retirement Income Security Act of 1974 ("ERISA") is not "review" at all. See, *e.g.*, *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 644 (7th Cir. 2007) (observing that confusion in this realm may be at least partially a product of the "common phrase" *de novo* review). Rather, when the *de novo* standard applies, a denial of benefits under an ERISA plan becomes essentially an ordinary contract dispute, albeit one in which federal common law rules of contract interpretation apply. *Id.* The task for a court that decides such a case is familiar; it must decide for itself "where the truth lies." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 842 (7th Cir. 2009). In making that truth determination, the Federal Rules of Civil Procedure impose limits on judges at the summary judgment phase. A credibility determination that may be appropriate after a bench trial, for example, cannot properly be made on a motion for summary judgment.

Old habits die hard, however, for the abuse of discretion standard to which litigants have become accustomed seemingly pervades the way that many litigants think about (and argue) ERISA cases. This case illustrates the challenges of adapting to the clarified procedural environment. The Seventh Circuit has stressed that "[i]f a paper record contains a material dispute, a trial is essential." *Krolnik*, 570 F.3d at 844. Here, the parties relied almost entirely on the paper administrative record, one that is pockmarked (if not permeated) by factual disputes relating to whether Plaintiff was disabled prior to the termination of his employment (and with it, his coverage) in August 2005. For that reason, the Court denies the parties' cross-motions for summary judgment [54, 62].

## I.      Procedural Background

Plaintiff, Alvin L. Hintz, Jr. ("Hintz") filed this lawsuit on March 3, 2008, pursuant to the Employee Retirement Security Act of 1974 (29 U.S.C. § 1001 *et seq.*) ("ERISA"). Hintz's complaint alleges that Defendant, Prudential Insurance Company of America ("Prudential") improperly denied, under an employee welfare benefit plan, long term disability ("LTD") benefits to Hintz, who suffers from multiple maladies that rendered him disabled within the meaning of the plan. His suit is based on 29 U.S.C. § 1132(a)(1)(B), which allows a plan participant or beneficiary to "recover benefits due to him under the terms of the plan." Prudential's answer generally denies Hintz's operative factual allegations and asserts several affirmative defenses. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132.

After Hintz amended his complaint, dropping as a defendant "Long Term Disability Coverage for Class 1: US Executives of CCL Custom Manufacturing, Inc.," the parties engaged in discovery and then filed cross motions for summary judgment [54, 62]. The parties' motions

and supporting memoranda [see 54, 55, 62, 63, 69, 71] argue, although reaching opposite conclusions, that there is no genuine dispute of material fact as to Hintz's disability status. As already intimated, the Court concludes that neither party is correct.

## II.     Facts

The Court takes the relevant facts primarily from the parties' respective Local Rule ("L.R.") 56.1 statements: Defendant's Statement of Facts ("Def. SOF") [64], Plaintiff's Response to Defendant's Statement of Facts ("Pl. Resp. Def. SOF") [70], Plaintiff's Statement of Facts ("Pl. SOF") [53], and Defendant's Response to Plaintiff's Statement of Facts ("Pl. Resp. Def. SOF") [65].[1]

### A.     Hintz's Employment and Long Term Disability Benefits Policy

Alvin Hintz was employed as the Director, Information Systems with CCL Custom Manufacturing, Inc., ("Custom Manufacturing") in Danville, Illinois, for more than 10 years. PRU 118. Prior to Hintz's termination, the Company was purchased by KIK Custom Products, Inc. ("KIK"). Pl. Resp. Def. SOF ¶ 5. As discussed more fully below, Hintz claims—and

---

[1] L.R. 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. at 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Additional facts, if necessary to the Court's analysis, may be provided in other portions of this memorandum opinion and order.

Prudential denies—that he was only able to continue working under medical restrictions and accompanying workplace accommodations. See Pl. SOF ¶¶ 7, 13; Def. Resp. Pl. SOF ¶¶ 7, 13.[2]

A few months after KIK took over Custom Manufacturing, on August 8, 2005, Plaintiff's employment was terminated. Pl. SOF ¶ 15. Eight other employees were terminated around that period of time. Def. SOF ¶ 16[3]; PRU 272-77; see also id. at 130. The separation agreement that Hintz signed included a "general release of claims and promise not to sue." In pertinent part, the release provided that Hintz would "to the extent permitted by law * * * [agree] not to sue * * * employee benefit plans * * * for any and all claims * * * arising under federal, state or local laws relating to employment, including * * * the Employee Retirement Income Security Act * * *." PRU 273.

The long term disability plan at issue in this case, Group Insurance Policy No. G-41356-IL (the "Policy"), was underwritten and insured by Prudential and was part of CCL's employee welfare benefit plan. Def. Resp. Pl. SOF ¶ 10. Hintz was covered by the Policy incident to his employment with CCL, and therefore is a "participant" in the statutory parlance. Id.; see also 29 U.S.C. § 1002(7).

The Policy contains the following definition of disability:

You are disabled when Prudential determines that:
- You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

_____

[2] Although Plaintiff supports these fact statements only with citations to its complaint, subsequent allegations related to workplace accommodations are based on admissible record evidence. See, e.g., PRU 118-22.

[3] Plaintiff improperly denied this fact statement by stating only that it did not have "sufficient knowledge" to admit the fact statement. See Pl. Resp. Def. SOF ¶ 16. Therefore, the fact statement is deemed admitted.

Def. SOF ¶ 9. "Material and substantial duties," in turn, are defined as duties that "[a]re normally required for the performance of your regular occupation" and which "[c]annot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week," then you will not be disabled if you "have the capacity to work 40 hours per week." Def. SOF ¶ 10.

The policy also sets out seven types of information that a claimant must provide in order to prove a claim, including "*[a]ppropriate* documentation of the disabling disorder." PRU 23 (emphasis added). Finally, the Policy has a limited pay period for a sickness or injury which, "as determined by Prudential, are [sic] primarily based on self-reported symptoms." PRU 18. Self-reported symptoms means those symptoms for which "the manifestations of your condition * * * [reported to your doctor] are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy." PRU 19.

**B.    Hintz's Pre-Termination Medical History**

The record indicates that prior to the termination of Hintz's employment, Hintz sought treatment for a number of medical conditions.

On January 27, 2003, Hintz saw Dr. Paul R. Wilson at the Carle Foundation Hospital. Dr. Wilson's "progress notes" do not indicate the reason for Hintz's visit. The notes state that Hintz had "suboptimally controlled insulin-requiring diabetes." PRU 479; Def. Resp. Pl. SOF ¶ 34. The notes further indicate that Hintz had "significant hyperlipidemia," as well as hypertension. PRU 479. Dr. Wilson's plan states, in part, that "[Hintz] is to work much harder

on diet and exercise," that he "was [sic] started back with cardiac rehab,"[4] and that Hintz was to return for a follow up visit and lab work in 8-10 weeks. *Id.*

On July 7, 2003, Hintz saw Dr. Lynette Smith-Caillouet. Doctor Smith-Caillouet was Hintz's primary care physician. PRU 282. The doctor's notes from the July 2003 visit indicate that the purpose of the visit was to "follow-up on his blood sugars[,] to get his blood pressure checked[, and] to go over his cholesterol." PRU 483. During the visit he also complained of insomnia and reported "baseline fatigue." *Id.* The notes recount Hintz's past medical history, describing that history as "significant for diabetes hyperlipidemia, coronary artery disease, status post bypass grafting." *Id.*; Pl. SOF 34. The doctor also stated that Hintz needed to get his blood sugars under control: "[T]his patient has promised he is going to exercise and watch his diet." PRU 483-84.

On November 18, 2003, Hintz saw Dr. Smith-Caillouiet again. Hintz came in for the visit because he "wanted his chemical stress test done. He wanted a colonoscopy set up, he is having trouble walking due to his right foot pain, [and] he wanted to see a cardiologist." PRU 486. Hintz also stated that he "want[ed] the requirements for early retirement. * * * [W]hen he is doing exercise at his rehab place * * * he starts coughing or like he will get some coughing and some tightness in his chest when the weather has certain temperature changes especially toward cold and wet." *Id.* Dr. Smith-Caillouet's assessment and plan from the visit reads as follows:

> **Assessment**:
> 1.      Hypercholesterolemia. Tryglycerides are high despite Gemfibrozil and Lipitor combination. He is actually going to see a cardiologist as consult in December, Dr. Mokraoui and I will elicit Dr. Mokraoui [sic] expertise in cholesterol management to help me with this patient * * *. I think he clearly has

---

[4] Hintz had coronary bypass surgery in 1998, which is alluded to in many of the medical records in the administrative record, although the parties do not point to records related to that surgery specifically.

coronary risk factor events and it would be nice to optimize these particular labs so that his risk factors would be lower.

2.       His diabetes also puts him at risk for further cardiovascular event [sic] especially being uncontrolled. * * *

**Plan:**
He wants a dobutamine stress echo, I think that is a good idea although the patient is not having any coronary symptoms * * *.

PRU 486-87 (emphasis in original).

On December 16, 2003, Hintz saw Dr. Malec Mokraoui in order "to establish care and also determine what his long-term prognosis is." PRU 493. Dr. Mokraoui's notes from the visit, in pertinent part, read as follows:

This gentleman underwent three vessel coronary bypass surgery in 1998. * * * This was done because of new onset angina at that time. He did reasonably well over the years. He underwent a dobutamine stress echo early this month which was nonischemic.[5] * * *

**REVIEW OF SYSTEMS:**   Cardiovascular: He currently denies any chest pain. He has mild shortness of breath (class I). One should note, however, that he leads a semi-sedentary lifestyle as he is traveling a lot. He has not been very compliant with his diet. He denies any PND or orthopnea. He is unaware of any palpitations. He denies claudication or swelling of his lower extremeties.
General:  His major complaint is fatigue at the end of the day. * * *
Pulmonary: Negative for wheezing, cough, sputnum production, or hemoptysis.
CNS:  No prior history of stroke, seizures, or headache.
Musculoskeletal:  He suffers from pain in his feet which is possibly related to diabetic neuropathy. * * * He did undergo vascular studies on his lower extremities and no evidence of vascular disease was found.

* * *

**PHYSICAL EXAMINATION:**   This is a pleasant gentleman in no obvious distress.

* * *

**RECOMMENDATIONS:**   Mr. Hintz has documented coronary artery disease from which he is asymptomatic; however, he has not been managing his risk factors quite well. His blood pressure, diabetes, and lipid profile are under control.

---

[5] Ischemia refers to a "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 920 (29th ed. 2000).

* * *

The second issue is his lipid profile. He does have clearly combined hyperlipidemia. I have urged him to place himself on a low carbohydrate and low fat diet. * * *

The third issue is his hypertension. Being a diabetic, his systolic blood pressure should be below 130. * * * I believe he sees Dr. Wilson for his diabetes which is not very well controlled. * * * I have encouraged him to remain physically active. I had a long discussion with him about risk factor modification and its importance. I urged him to modify his lifestyle and consider cutting down his traveling and exercise more. Since he is stable, I will see him on a yearly basis.

PRU 493-96.

On February 10, 2004, Dr. Smith-Caillouet examined Hintz. Hintz went to the visit complaining of right calf discomfort that had started the previous month. The pain was described as starting in the back of his calf and then radiating "downward toward the lateral ankle." PRU 498. Activity seemed to intensify the symptoms. He reported no swelling, nor did the doctor detect "appreciable" swelling as between his two calves. During the visit, Hintz stated that "he walks a mile and a half several times a week as part of his cardiac rehab." PRU 498. "He reports his exercise has been taking longer and longer because he needs to stop and rest to make the pain go away in his right calf. He states he occasionally has some cramping in his feet." *Id.* Smith-Caillouet's assessment states that he had right calf pain and claudication, which is pain and/or cramping in the lower leg due to inadequate blood flow to the muscles. Def. Resp. Pl. SOF ¶ 37 & n.14.

On April 5, 2004, Hintz saw another doctor—the name of the author is disputed by the parties although Defendant has not otherwise questioned the authenticity of the notes from the visit. The author of the notes states that Hintz was "seen in the collaborative service of Dr.

Smith-Caillouet."[6]  The notes from that date state that Hintz underwent an abnormal arterial study that revealed claudication in both legs, worse in the right leg than in the left.  The examination was positive for leg pain with ambulation.  Hintz was assessed with right lower extremity claudication with peripheral vascular disease, as well as coronary artery disease and hypertension.  PRU 505-06.

On April 7, 2004, Hintz underwent an abdominal aortogram, oblique pelvic arteriogram, and bilateral lower extremity run-off angiogram.  The procedure revealed infrapopliteal peripheral vascular disease and mild aortoiliac and infrainguinal disease.  Pl. SOF ¶ 39; PRU 603.

On April 19, 2004, Hintz underwent right popliteal to perineal bypass.  This type of procedure is used to bypass diseased blood vessels above or below the knee.  Pl. SOF ¶ 40 & n.15.

On September 30, 2004, Hintz was seen by "sgd," who was, according to the medical notes, treating Hintz "in collaborative practice with Dr. Smith-Caillouet."  PRU 521.  Hintz came to the medical clinic reporting sudden rib pain brought on by coughing the night before.  Pl. SOF ¶ 41; PRU 521.  He did not report shortness of breath, chest pain, nausea or vomiting.  However,

---

[6] This notation, along with the fact that Smith-Caillouet was copied on the notes, suggests that Defendant is incorrect in its assertion that Smith-Caillouet was the author of the notes.  See Def. Resp. Pl. SOF ¶ 38. Other than that, Defendant objects—as it has to 23 more of Plaintiff's fact statements—that Plaintiff's fact statement is not a short statement as L.R. 56.1 requires.  That objection is meritless in this case as in most others.  In fact, Plaintiff's fact statements are not appreciably longer than Defendant's.  Defendant also raises its frequent objection that Plaintiff has failed properly to summarize the document in question by summarizing in a misleading way.  Defendant then "admits" statements (favorable to Defendant) that were included in the document.  The Court has disregarded such objections and instead has undertaken its own examination of the record to determine if Plaintiff's fact statements comply with the local rules and enjoy record support.  Had Defendant made objections that said something along the lines of "Plaintiff's fact statement is misleading because it omits $x$," then the objections may have merited more considered attention.  But instead of raising specific objections, Defendant repeatedly used its objections as vehicles for smuggling into the record that which Defendant wished to emphasize in the documents in question. Such objections are not well taken.

he was very uncomfortable with sitting to standing. PRU 521. On October 4, 2004, Dr. Smith-Caillouet again examined Hintz for coughing and rib pain. He was assessed with costochondritis, which is an inflammation of the cartilage that connects a rib to the breastbone. Pl. SOF ¶ 42 & n.16. He was prescribed two drugs for the condition. Dr. Smith Caillouiet's plan for treatment, noting the prescribed drugs, states: "Hopefully that will give him enough relief that he can go on his trip, but if not he will stay home and let us know if it does not continue to improve over the next week." PRU 524.

On October 15, 2005, Hintz was examined at the Carle Clinic for continuing intermittent discomfort due to his ribs. The notes from the visit state that Hintz "[h]as been taking Darvocet [one of the two prescribed drugs] especially when he travels which is helpful in relieving the discomfort." PRU 526. The physical examination revealed "1+ pitting edema in both of [Hintz's] lower extremeties." PRU 526; Pl. SOF ¶ 43; Def. Resp. Pl. SOF ¶ 43. The treatment plan notes state that

> [i]n regard to his diabetic meds he is just encouraged to stay more on his diet. He is on several medications for his diabetes that at this point will not be changed. He does report some dietary noncompliance. He travels frequently which makes it difficult to maintain his diet. In regards to his rib pain he is concerned about the left upper quadrant. We'll plan to ultrasound his upper abdomen and follow-up with him in a couple weeks * * *.

PRU 527.

On October 25, 2004, Hintz visited Dr. Smith-Caillouet after having reported a fall from a stepladder. Pl. SOF ¶ 44. Dr. Smith-Caillouet's notes read in pertinent part:

> The patient said that initially when he fell his leg hurt a little bit but it wasn't swollen and then suddenly he got acute swelling of his leg[,] got worried and came here. When we saw him he had excoriations of his left leg, it measured out to be about 41 centimeters which was about twice the size of the right leg. The foot itself felt warm although I could not appreciate any dorsalis pedis or posterior tibial pulses. The actual tibia area looked white with again the red excoriations

and some blood coming from that leg area and then a cold pack was placed on the patients [sic] leg while he was sitting here trying to reach his wife.

PRU 528. Dr. Smith-Caillouet sent Hintz to the emergency room. Pl. SOF ¶ 44.

On October 27, 2004, Dr. Smith-Caillouet saw Hintz for a follow-up after Hintz's emergency room visit. Pl. SOF ¶ 45. Hintz told Smith-Caillouet that he had followed the emergency room instructions regarding his leg injury but that the leg had gotten worse. The doctor's notes state that when Smith-Caillouet saw Hinz on October 25, the circumference of Hintz's leg was 41.5 centimeters. On October 27, the circumference was 45 centimeters and Hintz found it painful to walk. PRU 530. The leg had "lots of ecchymosis," which is skin discoloration caused by the escape of blood into the tissues from ruptured blood vessels. Pl. SOF ¶ 45 & n.19. Smith-Caillouet assessment stated that Hintz "may now have a venous clot in his legs." PRU 530. Smith-Caillouet's plan was to "do arterial and venous doppler * * * the earliest my staff here could get him in." PRU 530.

On November 1, 2004, orthopedic specialist Dr. Paul F. Plattner examined Hintz. Pl. SOF ¶ 46. The exam revealed that Hintz "ha[d] ecchymosis involving the entire leg from the thigh to the toes. The toe ecchymosis came on after the fall several days ago, consistent with a hematoma that extravasated distally into the leg and foot with gravity." PRU 533. The notes continue:

> On exam today reveals that he has a girth of 42 cm on the right calf vs 44.5 cm on the left. The calf is supple but swollen. It is not particularly painful. He has a good range of motion of the foot and ankle with no sign of compartment syndrome. There is some blistering over the skin of the pretibial area consistent with blistering from swelling.

PRU 533. Plattner's assessment was for "hematoma of the left calf secondary to contusion." *Id.* Plattner's plan was to "continue with activity modifications and elevation * * *. Hopefully as time goes on this will improve and he will continue to improve." *Id.*

On November 1, 2004, Hintz visited Smith-Caillouet for multiple reasons, including for continued pain in his left lower extremity. Pl. SOF ¶ 47; PRU 535. The pain had "not gotten progressively worse" but instead "just stayed the same and never [got] any better." PRU 535. Dr. Smith-Caillouet examined Hintz's leg and reviewed the results of Hintz's venous duplex. Smith-Caillouet stated that the venous duplex "was significant for hematoma."[7] PRU 536. Dr. Smith-Caillouet's assessment included: left leg pain, cellulitis, diabetes mellitus, and insomnia. PRU 536. "He was also given a referral to Dr. Plattner to evaluate the hematoma and drain it if needed." *Id.*

A November 5, 2004[8], examination (the identity of the doctor, as with the September 30 visit, is noted as "sgd"), stated that

> [Hintz] comes to the clinic today as a follow up. He reports that he did see Dr. Plattner who recommended that he have some physical therapy to help reduce the swelling in his leg. He has been seeing Physical Therapy. Today, he is concerned that his leg still looks pretty bad. There is no increase in pain. He is currently taking antibiotics.

PRU 538. The notes from the doctor's examination state that Hintz had continued ecchymosis from his hip to his toes, but that it was beginning to lighten. "Circumference of his left calf measures [41.5] cm. [sic] which is down 2 cm. [sic] since we last checked his calf circumference." The doctor assessed Hintz with cellulitis and hematoma. *Id.*

---

[7] The definition of hematoma contains multiple entries, but its general definition is "a localized collection of blood, usually clotted, in an organ, space, or tissue, due to a break in the wall of a blood vessel." DORLAND'S ILLUSTRATED at 796-97.

[8] Plaintiff's fact statement says that the visit was on November 4, but Defendant correctly points out that the document itself states that the visit was on November 5. Def. Resp. Pl. SOF ¶ 47. Defendant is incorrect, however, in its assertion that the typographical error affords grounds for denying the fact statement. See *id.* ("Prudential denies that the records referenced refer to an office visit on November 4, 2004, and as such denies all statements relative to same as unsupported."). The Court has noted the proper date in the body of this opinion; because Defendant did not deny the content of the statement, Pl. SOF ¶ 47 is deemed admitted.

On December 9, 2004, an echocardiogram revealed mild left ventricular hypertrophy and abnormal septal motion. Pl. SOF ¶ 48; PRU 623.

On January 6, 2005, Plaintiff saw Dr. Mokraoui for a yearly follow-up appointment. Def. Resp. Pl. SOF ¶ 53. Dr. Mokraoui's notes recount Hintz's April 2004 "right fem-pop bypass surgery" and state that he "has more or less recovered" (PRU 553). The notes continue:

> He has some residual discomfort from his ankle in the medial malleolus up to his knee parallel to the incision line. This is despite the fact that the incision is well healed. He also apparently fell and injured his left leg a few weeks ago and sustained a hematoma in that calf. He underwent repeat vascular study in both lower extremities and was found to have no significant vascular abnormalities. Otherwise, he has done reasonably well from a cardiac standpoint. He denies any chest pain or dyspnea.
>
> * * *
>
> **RECOMMENDATIONS**
> Although Mr. Hintz cardiac status is stable, he needs aggressive risk factor modification. * * * I also have advised him on a low carbohydrate diet. He will also need to have his blood pressure monitored closely; since he is diabetic, he needs to get his systolic down below 130 if not below 125. I encouraged him to restart his exercises in an attempt to lose some weight and improve his physical fitness. * * * I will see him in a year or earlier should he have any problems.

PRU 553-54.

On May 25, 2005, Dr. Lynette Smith-Caillouet saw Hintz for his type II diabetes mellitus, to refill certain prescriptions, and for a complete physical examination. Pl. SOF ¶ 19[9]; PRU 248. Dr. Smith-Caillouet's notes laud Hintz:

> I am so proud of this patient who I have had difficulty in the past getting his cholesterol and blood sugars under good control. He has actually done very very well for this patient and like I said I am very proud of him and I asked him to continue to do even better. He has a job where he travels a lot on the road and so dieting has been an issue in the past and he has been more stable at home lately

---

[9] Defendant denies the fact statement as "unsupported by the record referenced." Def. Resp. Pl. SOF ¶ 19. Plaintiff's fact statement says that Smith-Caillouet *prescribed* the medications in question. Defendant perhaps bases its objection on the statement in the document that Smith-Caillouet refilled—rather than prescribed—the medication. Regardless, the Court relied on the content of the document rather than on Plaintiff's fact statement.

and it looks like it has made a difference with regard to his overall status with regard to his cholesterol and blood sugars. He actually also has a past history of coronary artery disease. He is status post bypass grafting. He also had hurt his leg last year and that actually did heal. He fell off a ladder and his other past history includes peripheral vascular disease with Fem-Pop bypass grafting.

* * *

OBJECTIVE: * * * The cardiovascular exam is regular rate and rhythm. S1, S2, without any extra heart sounds or murmurs. The abdomen is soft, nontender, non distended. * * * Extremities are without clubbing, cyanosis, or edema. Neurologic exam is within normal limits. * * * No abnormalities are felt. The result of the evaluation is essentially unremarkable today.

* * *

PLAN: We will check a glycohemoglobin on him in three months. We will do it in August 2005 * * * [A]lso the patient has hypercholesterolemia. His cholesterol looks great today at 157 with normal liver function tests so in six months, which will be November of 2005, we will recheck a lipid panel, liver function test and for now we will keep the Lipitor and the Gemfibrozil at their current doses. He has peripheral vascular disease and is scheduled for an arterial Doppler in June 2005 and I will await those results.

PRU 248-49.

On June 20, 2005, Hintz had an arterial Doppler study. Pl. SOF ¶ 49.[10] The study revealed an absence of Doppler signals in the right dorsalis pedis and left posterior tibial artery, both of which were presumed occluded. *Id.*; PRU 621. Then, on June 28, 2005, Hintz visited Dr. Timothy L. Connelly. Pl. SOF ¶ 20. Dr. Connelly's note from that day states:

Patient had a recent Doppler study showing a patent right popliteal perineal vein graft. His Doppler studies are basically unchanged.

He can walk about a mile and a half without difficulty and overall is doing well. He complains of soreness in his feet, which awakens him at night. It is unclear whether this is truly neuropathy or not. It certainly is not rest pain. He tried

---

[10] Prudential denies the fact statement, although Hintz quoted the document nearly verbatim. Instead Prudential "admits" facts from the report that are apparently more favorable to Prudential. Smuggling in facts in that manner is prohibited; the Court has disregarded Prudential's noncompliant denial and deemed admitted Plaintiff's Statement of Fact ¶ 49.

Neurontin for several months and it did not help. This makes me think that it is not neuropathy.

We will plan to see him back in six months with a Doppler and duplex.

PRU 124.

## C. Hintz's Post-Termination Medical History

On December 12, 2005, a little more than four months after Hintz's termination, Hintz underwent an arterial Doppler as a follow-up to his right popliteal-to-peroneal bypass graft. PRU 610. The Doppler study revealed patent right popliteal-to-peroneal bypass graft and indications of infrapopliteal disease. Pl. SOF 51[11].

On December 20, 2005, Hintz saw Dr. Timothy L. Connelly and reported that he had been experiencing chest discomfort after walking for eight minutes on a treadmill. After noting Hintz's report regarding chest pains, Dr. Connelly's notes state the following:

> This is a new situation for him, whereas he was walking about a mile or so before without difficulty. His legs are clinically stable. His duplex study showed a patent graft in his right leg and a stable arterial situation. He is due to see Dr. Smith-Caillouet on Friday and has already had a stress test scheduled, but it sounds as though he is having angina. He has Nitroglycerin at home, but has not used it. We will see him again in six months to recheck is [sic] leg.

PRU 568; see also Def. SOF ¶ 22.

On December 23, 2005, Hintz saw Dr. Lynette Smith-Caillouet. Dr. Smith-Caillouet's notes recount the reasons for Hintz's visit: among other things, he complained of decreased exercise tolerance with shortness of breath and that "the cold air is affecting him for the first time in his life." PRU 245-46, 569; Def. SOF ¶ 23; Pl. SOF ¶ 21. Dr. Smith-Caillouet's notes next recount Hintz's medical history, which included: type 2 diabetes mellitus, hypertension,

---

[11] Defendant denies the fact statement, although Plaintiff quoted the document nearly verbatim. Instead Defendant "admits" facts from the report that are apparently more favorable to Defendant; again, introducing facts in that manner is prohibited. The Court has disregarded Defendant's noncompliant denial and deemed admitted Plaintiff's Statement of Fact ¶ 51.

gastroesophageal reflux disease, hyperlipidemia, allergic rhinitis, coronary artery disease, periperovascular disease, and esophageal strictures. PRU 245. The notes state that Hintz's lungs were "clear to auscultation bilaterally." PRU 245. His heart had a "[r]egular rate and rhythm, S1 and S2 without any extra heart sounds or murmurs." PRU 245. At the conclusion of the notes, under a section captioned "ASSESSMENT AND PLAN," the notes state:

1.  He has generalized fatigue with decreased exercise tolerance. We have a Dobutamine stress echo set up for next week and a Cardiology re-evaluation so I await those tests.
2.  All of his medicines were refilled.
3.  Diabetes mellitus. His glycohemoglobin was horrible at 8.3% but he just switched to Lantus so in February of 2006, I will repeat the Aic and make appropriate adjustments to his medications.
4.  He has hypertension. This is well controlled on Lisinopril and Metoprolol therapy. Will continue those medications at their current dose [sic].
5.  Hyperlipidemia. His cholesterol is 153 with normal liver function tests and so will continue his Gemfibrazil and Lipitor at the current dose and reassess her [sic] cholesterol in May of 2006.

PRU 246.

On December 28, 2005, Hintz underwent a Dobutamine[12] stress test. The test yielded "adequate and non-ischemic" results. Def. SOF ¶ 24; PRU 613. The report noted mild left ventricular hypertrophy. Pl. SOF ¶ 52.

Eight days later, on January 5, 2006, Hintz saw Dr. Malec A. Mokraoui for a yearly follow-up. Mokraoui's notes state that

[o]ver the last two months [Hintz] has noted some chest discomfort when he walks. He used to walk up to five miles at the mall without any major problems. Over the last two months, he is only able to walk for six to eight minutes and then have to sit down because of tightening sensation in his chest, as well as dyspnea. Usually the symptoms subside within two or three minutes and he is able to resume his physical activity. This is rather unusual for him. He has not had any discomfort at rest or lasting more than 20 minutes. He has not used any

---

[12] Dobutamine is "a synthetic catecholamine used as an adrenergic with cardiotinic actions." DORLAND'S ILLUSTRATED at 538. Weaving together the definitions of the terms in that definition (id. at 298, 33, 288) the Court understands a Dobutamine stress test to comprise increasing the heart rate with medication and then monitoring the flow of blood to the heart.

sublingual Nitroglycerins as he has none available. * * * [H]e has developed significant dyspepsia over the last month. * * * He underwent a Dobutamine stress echo 10 days ago which showed no evidence of myocardial ischemia. Normal wall motion at rest.

* * *

As I mentioned previously, he had lost his job four months ago. He has been under a lot of stress because of that. He is currently on the hunt of [sic] a new job.

PRU 262; PRU 571-72; Def. SOF ¶ 25; Pl. SOF ¶ 22. Under a category in the notes captioned

"IMPRESSION," Dr. Mokraoui wrote:

1. Angina pectoris with negative DSE December 2005.
2. ASHD with remote coronary bypass surgery.
3. Combined hyperlipidemia.
4. Diabetes.
5. Peripheral arterial disease, status post right fem-pop bypass surgery April 2004.

PRU 263. Under a category in the notes captioned "RECOMMENDATIONS," Dr. Mokraoui

wrote:

Mr. Hintz' [sic] symptoms are compatible with angina pectoris. Since his DSE was negative for myocardial ischemia, optimizing his medical therapy is not unreasonable at this point. I have added Norvasc 5 mg a day to his beta-blocker and prescribed also some sublingual Nitroglycerin to use on a prn basis. We also, during this visit, discussed his lipid panel. Although there has been some improvement in his triglyceride level, it is sill high. I have advised him to start taking some fish oil capsules three times a day. His HDL remains low and his total cholesterol to HDL is more quite elevated. He needs to bring his LDL down to 70s if he wants to get more benefit from his statin therapy. Since he is intolerant to 60 mg of Lipitor, I have switched him to Vytorin 10/[illegible] once a day. I have asked him to have a repeat lipid panel in three months prior to returning to the office for follow-up. He was also instructed to contact the office should his chest discomfort worsen, particularly if it starts occurring at rest or lasting more than 20 minutes. No other changes were made in his medication. He is scheduled for a return visit in three months.

PRU 263.

A little more than three weeks later, on January 30, 2006, Hintz saw Dr. Smith-Caillouet again. The notes state that Hintz came into the office complaining of insomnia and congestion. The doctor's notes further state:

> [H]e is able to walk he has gotten increased exercise tolerance. We did a Dobutamine stress echo. His heart is wonderful. He feels some abdominal bloating and pain in his upper right quadrant right at the tip of the liver start of the pancreas with radiation into his back and he has had cholecystectomy so we need to follow-up on that.

PRU 242. His blood pressure is described as a "beautiful" 120/70. PRU 242. The doctor states that she "think[s] [Hintz] may have sleep apnea." PRU 242.

At some point—Hintz says February 9, 2006, but Defendant correctly states the date on the document indicates only that the dictation occurred on February 15, 2006—Hintz was diagnosed with severe obstructive sleep apnea. The polysomnogram revealed a sleep apnea-hypopna index of 95.5 per hour of sleep, where normal is less than 5. His "sleep efficiency" was described as "poor" at 39% and the report notes multiple awakenings during the night. PRU 606; Pl. SOF ¶ 54; Def. Resp. Pl. SOF ¶ 54.

On February 27, 2006, Hintz visited the emergency room at Carle Foundation Hospital. Pl. SOF ¶ 24. His "chief complaint/reason for admission" was listed as "shortness of breath for two and a half months and cough for one and a half months." PRU 213. The "Admission History and Physical" notes, prepared by Dr. Mohtraram Masood, read as follows:

> HISTORY OF PRESENT ILLNESS: This patient is a 58-year-old white male who has past medical history of coronary artery disease and status post bypass. Also has history of diabetes mellitus type 2. Came with complaints of progressive shortness of breath going on for about two and a half months now. According to patient, his initial shortness of breath was pretty much with exertion, and with passage of time, breathing problem got worse. Now he is short of breath at rest, according to him. It has been particularly worse for one and a half weeks now. Patient also complains of persistent, dry, hacking cough for about one and a half month's duration. He did have some longstanding right lower left rib cage pain which he describes that he gets it on and off for about few hours. Patient had a

negative stress test done in December 2005. Normal LV systolic function. He also has a lot of orthopnea with questionable PND. He complains of some weight gain and increasing pedal edema. Denies any fever or chills. Denies any nausea or vomiting. Denies any abdominal pain. Patient was seen by primary care physician last week, and she started patient on oral Levequin and Singulair, and patient's Lasix and potassium were cut back. According to the patient, that did not improve any of his symptoms.

* * *

ASSESSMENT: Likely congestive heart failure. History of coronary artery disease. History of diabetes mellitus type 2. History of hypertension. History of hyperlipidemia. History of peripheral vascular disease.

PLAN: Admit to telemetry floor. Will start patient on IV diuresis. Careful monitoring of his intake and output, his electrolytes, and his renal function. I will also do three serial cardiac enzymes and EKGs to follow up his EDG changes. Would require a cardiology consult. I did briefly talk to Dr. Tabriz, who was present in the emergency room and he recommended treating him for congestive heart failure. He will see patient in consult. Will do a DVT prophylaxis. As his D-dimer is elevated, will also do a V/Q scan in the emergency room. Control his diabetes and hypertension. Continue his home medication. Would repeat an echocardiogram to compare with his December echocardiogram.

PRU 213-214.

Apparently as part of the same emergency room visit on February 27, Hintz saw Dr.

Donald Bartlett. Bartlett's notes read as follows:

S:     HISTORY OF PRESENT ILLNESS: The patient is complaining of increasing shortness of breath since December, worse over the past two to three days. States that he usually walks at the mall and has only been unable [sic] to do half his usual distance and has been quite fatigued and short of breath at the end of his walk. In the last two days, has noted increased swelling in both of his ankles and feet. In the last two weeks, has gained 3-4 pounds, which is quite unusual for him. Has not been eating quite as well. Appetite has been down. Has had some upper abdominal discomfort. In fact, approximately a week and a half to two weeks ago, had an abdominal CT for abdominal discomfort and it did show some bilateral pleural effusions. He was started on Lasix 20 mg by his primary care physician, but it seemed to drop his blood pressure, so it was reduced to 20 mg [sic] a day. He denies any chest pain with this. He did have angioplasty done in 1998 and has been doing well since that time. He was found to be diabetic and subsequent workup in periods. The

patient denies any episodes of diaphoresis with this. No leg pains, no syncopal episodes.

O:    PHYSICAL EXAMINATION:
      CHEST:  Clear to auscultation.

      Chest x-ray does show cardiomegaly, increased vascular markings and some pleural effusion, especially on the left. His electrochardiogram shows new ST segment depressions laterally consistent with lateral wall ischemia.

P:    1. Hep lock will be started. The patient will be given 40 mg of Lasix while we keep a close eye on his blood pressure. We are still awaiting laboratory work. I spoke with Dr. Tabriz in Cardiology as well as Dr. Masood about admission.

PRU 216.

On February 28, 2006, Hintz had an echocardiogram. The comments on the report state:

A TRANSTHORACIC study was performed.

Trileaflet aortic valve, Mild thickening of aortic valve, Cusp motion well preserved and No aortic regurgitation detected.

Mild thickening of the mitral valve leaflets, Mitral valve leaflet motion is well preserved and Mild to moderate mitral regurgitation detected.

Mild thickening of tricuspid valve leaflets, Mild tricuspid regurgitation detected, Normal pulmonic valve morphology and motion and No pulmonic regurgitation detected.

Normal RV chamber size, Normal RA chamber size and Moderate LA enlargement.

Normal LV chamber size and Mild left ventricular hypertrophy is noted.

No significant pericardial effusion noted.

Mild-to-moderate global LV hypokinesis present.

PRU 174.

On March 2, 2006, Hintz was discharged from the hospital. His "Discharge Summary,"

drafted by Dr. Ijlal Uddin, states:

DISCHARGE DIAGNOSES:
1.      Congestive heart failure exacerbation.
2.      Hypertension.
3.      Coronary artery disease.
4.      Peripheral vascular disease.
5.      Diabetes mellitus.
6.      Atrial flutter/supraventricular tachycardia.

DISCHARGE ACTIVITY INSTRUCTIONS:  As tolerated.

* * *

HOSPITAL COURSE: Patient is a 58-year-old white male with coronary artery disease, status post CABG in 1998, hypertension, diabetes mellitus, peripheral vascular disease, admitted on February 27, 2006, with shortness of breath at rest without apnea for 5 days and bilaterial basilar lung crackles.  Patient was admitted to medical floor and was treated for pulmonary edema secondary to CHF exacerbation with Lasix 40 mg twice a day.  Cardiology was consulted and they agreed with the diagnosis and treatment of CHF.  The patient's shortness of breath improved with IV Lasix.  Patient's cardiac enzymes were also checked, and the CK-MB came within normal limits and troponin I was mildly elevated with values of 0.44 and 0.41.

Cardiology did not think that the patient had any ischemic event going on.  Patient's renal function deteriorated post diuresis and patient's creatinine went up to 1.6 from 1.3 and his BUN went up from 21 to 26.  After that, the patient's Lasix dose was decreased to 20 mg IV twice a day.  Patient also developed hypotension and his antihypertensive medications, Lisinopril, Norvasc were held.  Patient's metoprolol dose was also held twice.

Patient also had bilateral lower extremity swelling when he was admitted which responded well to Lasix.  Right leg was more swelled up than left leg.  Patient got Doppler studies done to rule out DVTs in right lower extremity, which came back negative.

Patient developed rapid regular narrow complex tachycardia with questionable twitching movement when he moved around.  Patient's EKG showed rapid heart rate with narrow QRS complex, no ST-T wave changes.  Cardiology was re-consulted.  Cardiology recommended EP consult to evaluate any new cause of atrial flutter/SVT.  Episodes nurse practitioner evaluated the patient and thought that this rapid ventricular rate is secondary to Metoprolol dose holding.  Patient did not have any rapid ventricular response.

Today, on the day of discharge, patient is asymptomatic.

* * *

DISCHARGED INSTRUCTIONS: Patient is instructed to come back to the hospital if he redevelops leg swelling or if he develops difficulty breathing. He was also instructed to call 911 as soon as worrisome symptoms occur.

PRU 167-68.

On March 6, 2006, Hintz followed up with Dr. Smith-Caillouet after his stay at Carle Hospital in Urbana:

The discharge was done by Dr. Uddin said [sic] that he had congestive heart failure exacerbation, hypertension, coronary artery disease, peripheral vascular disease, diabetes mellitus, a flutter with supraventricular tachycardia. Cardiology did not think he had an ischemic event that went on. He had a renal function that deteriorated post-diuresis. His creatinine went up and his HUN went up and so the Lasix was decreased and he was sent home.

* * *

His chest x-ray today * * * looks like he just has some significant cardiomegaly.

* * *

PLAN: We will set him up with Dr. Mokraoui. He has questions about disability. He has been trying to find a job and he is under the impression he is going to die from congestive heart failure soon and so he wants to know what [sic] he should be getting disability for his congestive heart failure. I told him this was only one case and it was mild and I did not think he was disabled but I will see what Dr. Mokraoui says.

PRU 236-37; Def. SOF ¶¶ 29-30.

On March 21, 2006, Hintz underwent angioplasty and coronary stenting of the saphenous vein graft to the left circumflex obtuse marginal branch, as left heart catheterization identified an irregular, distal graft stenosis in the 90-99% range. Pl. SOF ¶ 27. On March 28, 2006, Hintz again was admitted to the hospital, complaining of a variety of symptoms, including weakness, and difficulty speaking. PRU 160. That day, he reported falling after experiencing lightheadedness. *Id.* After a CT scan, which did not reveal any bleeding, he was sent to the

emergency room where it was noted that he had "some questionable palpitation." *Id.* The notes include this "impression and plan:"

> By history cerebral TIA x2. Worry about a cardioembolic phenomenon. Patient has enough risk factors. He also has underlying comorbidities including coronary artery disease, peripheral vascular disease, systolic CHF dysfunction, hyperlipidemia, type-2 diabetes, hypertension. Patient will be admitted for IV heparin. Close serial neuro exam, vital exam, and vital monitoring. Admit to Telemetry. Get Neurology consult, TEE, carotid studies, and will go from there. Patient is a full code. He is agreeable with the treatment plan. Continue rest of home medication, including his diabetic meds. Close watch on his blood sugar.

PRU 161.

### D. Plaintiff's Claim for Benefits

On or about April 4, 2006, Hintz submitted a claim for long term disability benefits under the Policy. In response to the question, "What medical condition is preventing you from working," Hintz wrote, "Congestive heart failure, main right brain artery stenosis, failed bypasses, [peripheral artery disease], diabetes." PRU 131; Pl. SOF ¶ 16. In response to the question, "How does this condition interfere with your ability to perform your job," Hintz wrote, "Fatigue, weakness, inability to withstand travel, high risk of heart attack, stroke." PRU 131; Pl. SOF ¶ 17. Hintz listed 1998 as the year in which he was first treated for his condition, although he did not list a date on which he was "first absent" from work. PRU 130. Under the job category section, Hintz checked boxes for both "sedentary" and "other," describing the latter as "heavy travel requirement of 30 to 90%." PRU 130. The job description provided to Prudential by Hintz's employer indicated that 1/3 to 2/3 of his occupation involved sitting and 1/3 or less of his occupation involved climbing of stairs, standing, and walking. Def. SOF ¶ 35. Plaintiff denies the fact statement, pointing out record evidence that his job was not sedentary and required overtime and travel. Pl. Resp. Def. SOF ¶ 35.

The supporting documentation for Hintz's claim included records for medical treatment that was rendered in March and April 2006. Def. SOF ¶ 36. Hintz also submitted a list of procedures that had been performed and certain details of his medical history that predate his termination of employment, including triple bypass surgery and diabetes diagnosis (July 1998) and an arterial bypass in his right leg in April 2004. Pl. Resp. Def. SOF ¶ 36. Hintz's materials also included an attending physician's statement from Dr. Mokraoui. Dr. Mokraoui's statement was signed on April 4, 2006. The statement says that "patient is permanent [sic] disabled from his heart condition," that his prognosis for return of function/return to work is "poor," and that significant loss of function occurred in August of 2005. Pl. SOF ¶ 18, PRU 282-83.[13]

After receiving Hintz's claim and request of Hintz's medical records, Prudential referred Hintz's file for a capacity and clinical review by its clinical department. The review was to be performed by a clinical consultant (rather than by examination) and the suggested date range of the review included records from January 2005 forward. Def. SOF ¶ 37, PRU 295. Nurse consultant Collette Howe, RN, rendered a six-page report. The conclusion of the report read:

> It appears ee did not have any cardiac related complaints prior to 8-8-05. There are no drs tx'ment records during this time frame to support ee was not able to perform the duties of his job. EE developed chest pain, SOB approximately early November 2005. EE had normal ECHO 12-05, but developed left ventricular dysfunction as of approximately March 2006 & underwent heart stent on or about 3-21-06. As of 5-06 ee doing well with residual fatigue, weakness & to start light cardiac rehab.

PRU 301; Def. SOF ¶ 38.

On June 27, 2006, Prudential denied Hintz's claim. The denial letter stated, in part, that "the information on file [indicated] that you did not have any cardiac related complaints prior to

---

[13] Prudential objected to Plaintiff's fact statement ¶ 18 "to the extent it misrepresents the content of the Attending Physician's Statement." Def. Resp. Pl. SOF ¶ 18. However, Prudential points out no defect. Pl. SOF ¶ 18 is deemed admitted.

8/8/05. There are no records of treatment during this time frame to support that you were not able to perform the duties of your occupation as of 8/9/05." PRU 378; Def. SOF ¶ 39. Further,

> [y]ou did develop chest pain, and shortness of breath, approximately early 11/05. You had normal testing in 12/05, but developed left ventricular dysfunction as of, approximately, 3/06 and you underwent heart stent placement in 3/06. As of 5/06 it is noted that you are doing well with residual fatigue, and weakness. Although you would have possibly met the definition of disability in 11/05 due to your symptoms and ultimate stent placement, you were no longer covered under the [Policy] as of 8/9/05 * * *."

Def. SOF ¶ 39; PRU 378. The denial letter discussed only office visit notes from January 1, 2005, forward.[14] PRU 377.

On October 27, 2006, Prudential received Hintz's first request for reconsideration. Def. SOF ¶ 41. The request included a letter written that same month by Dr. Mokraoui. PRU 114; see also PRU 306. Dr. Mokraoui's letter stated that Hintz had been a patient since 2003 and that Hintz had coronary bypass surgery in 1998 and suffered from peripheral arterial disease which required surgical revascularization in April of 2004. The letter further stated:

> It is my opinion to a reasonable degree of medical certainty that Mr. Hintz was only able to perform the material and substantial duties of his position from April of 2004 to August of 2005 when he was terminated due to the accommodations made by his employer. It was not medically advisable for Mr. Hintz to continue working during that time frame and undoubtedly additional damage was done by doing so, but I understand he was a dedicated employee. I understand that Mr. Hintz had more and more difficulty performing the tasks of his job as time went on and that his attendance suffered over the last several months of his employment. Therefore, as soon as Mr. Hintz' [sic] employer could not make the accommodations necessary for him to continue working, then in my opinion he was disabled at that moment and would have been previously, but for those accommodations.

---

[14] Defendant denies the fact statement based on the text of the denial letter. Def. Resp. Pl. SOF ¶ 30. However, the text of the denial letter does not support Defendant's position: "We obtained office visit notes from 1/1/05 through the present from all of your reported treating providers in order to determine if you were considered disabled as defined in the [Policy] definition at the time that your disability coverage ceased." PRU 377. While the language does not foreclose the possibility that Prudential considered earlier time periods, Defendant did not draw the pertinent factual information to the Court's attention. See also PRU 382 (request to Lynette Caillouet for files "from 1/1/05 through present"). Pl. SOF ¶ 30 is deemed admitted.

* * *

[The justifications offered by Prudential for denying Hintz's claim fail] to take into consideration Mr. Hintz's coronary bypass surgery in 1998 and leg revascularization in April 2004 and other associated co-morbid conditions. In my opinion Mr. Hintz should have stopped working after the second revascularization. * * * Although the congestive heart failure was not diagnosed until January 2006, the condition responsible for it was likely present before August of 2005. Although, as I have indicated, in my opinion Mr. Hintz was disabled even without considering the congestive heart failure. Additionally, the normal testing in December 2005 [when Hintz had a Dobutamine stress test] should not be the basis for a determination because neither the sensitivity nor the specificity of this test is 100%. The mere fact that he had a dobutamine strest [sic] test as opposed to a treadmill stress test, in itself, indicates a level of disability. * * * In other words, not being able to perform a treadmill test is not a good prognostic sign.

* * *

In addition to his coronary artery disease, he also has multiple other medical problems, including diabetes, hypertension, hyperlipidemia, atrial fibrillation, peripheral arterial disease, cerebrovascular disease, ventricular dysrhythmias. These were present since 1998.

Based on the review of Mr. Hintz's records, it is my opinion that he is fully disabled and also not a candidate for vocational rehabilitation. Furthermore, his disability started in 1998 after he had his coronary artery bypass surgery. He became more incapacitated after his leg revascularization in April 2004, and continued to progress in terms of his cardiovascular disease at much faster rate since 2004.

PRU 114-15.

After receiving Dr. Mokraoui's letter, Prudential requested all medical records and records pertaining to accommodations due to restrictions placed upon Hintz by Dr. Mokraoui. Def. SOF ¶ 42. Prudential also contacted Hintz's employer to request copies of any accommodation notes or medical restrictions provided by any of Hintz's physicians from April 2004 through August 8, 2005. Def. SOF ¶ 43. Prudential also sent an e-mail to Kathy Lucia, the

Director of Retirement Benefits and HR Systems at KIK, asking for any letters regarding accommodations that were provided to the company by Mr. Hintz's physicians. PRU 335.

Hintz provided four letters from co-workers (at least one of whom was a former executive) of the company. PRU 118-121. The letter from former Vice President of Finance Randal J. Masbruch states that after Hintz's April 2004 surgery, the company "believed [Hintz's] health conditions to be serious and * * * made every effort to accommodate his circumstances, including allowing him to work from home, sharing duties with his staff, minimizing travel and minimizing stress as much as was possible due to the demands of his position." PRU 118. The Masbruch letter further states that Hintz's "health never fully recovered from the 1998 and 2004 episodes. During 2004 and 2005 his attendance at work continued to decline. * * * [H]e was having difficulty meeting the physical and stress demands of the job." *Id.* Other letters noted that Hintz had a "chronic cough" that would disrupt conference calls and conversations (PRU 119, 120), experienced difficulty speaking (PRU 120, 121), could not finish meals (PRU 121), experienced physical weakness (PRU 120), and was unable to unload his vehicle or otherwise lift small items without getting tired (PRU 121). See also Pl. SOF ¶¶ 57-60

On November 20, 2006, after receiving Dr. Mokraoui's records, Prudential sent the file to a cardiologist for a review. The cardiologist was Dr. Dianne L. Zwicke, M.D., FACC, FACP, FCCP. Zwicke, whose report is dated December 15, 2006, reviewed the following:

- Brief claims summary
- SOAP – DCMS notes dated May 9, 2006 (Mary Lou Byrnes); June 23, 2006 (Colette Howe, R.N.); November 20, 2006 (Joseph Walles); and telephone calls dated May 2, 2006 through May 9, 2006.
- Appeal letter from Attorney David Tuggle – October 23, 2006.
- Group Disability Insurance Employee Statement – April 4, 2006.
- Group Disability Insurance Employer Statement – May 1, 2006.
- Job description for Director of Information Services at KIK Custom Products.

- Medical records of Dr. Malec Mokraoui, M.D. (Cardiology Clinic) – Danville Clinic.
- Medical records of Lynette Smith Caillouet, M.D. (Primary Care Physician) – Danville Clinic.
- Select records from Carle Hospital – admission from February 27, 2006 through March 2, 2006.
- Admission history and physical from March 26, 2006 (believed to be Carle Hospital). Also included in this hospital record set was a Neurology consultation from Dr. Charles Davis, M.D.
- Social Security Disability award from October 27, 2006.

PRU 680-81; see also Def. SOF ¶ 45.

Dr. Zwicke's December 2006 report summarizes the above medical documentation. The portion of the summary that covers the period prior to his August 2005 termination up to his December 2005 Dobutamine stress test reads as follows:

The medical history provided includes the following:

1.    Coronary artery disease with Coronary Artery Bypass Graft Surgery in July 1998, with placement of the Left Internal Mammary Artery to the LAD, reverse saphenous vein graft from the aorta to the right coronary artery, and a reverse saphenous vein graft from the aorta to the ramus vessel. Per the medical records, Mr. Hintz was seen by his cardiologist on an annual basis. It is indicated that he underwent stress testing in December of 2004, that was within normal limits (a Dobutamine stress echo study). He underwent his annual stress testing in December of 2005 (again, a Dobutamine stress echocardiographic study), which was found to be non-ischemic (within acceptable limits).

PRU 681-82.

The Dr. Zwicke's conclusions came in the form of responses to questions. Zwicke opined on current restrictions that would be "expected" given Zwicke's review of Hintz's medical records. Def. SOF ¶ 46. Zwicke's responses to questions 3 and 4 speak to conclusions regarding Hintz's health prior to his termination, while question 5 relates in general to Hintz's prognosis:

**3.    Does the available medical documentation indicate in any capacity, that Mr. Hintz was on any medically required restrictions and limitations from his physician from 2004 through August 9, 2005? If so, please be**

**specific as to what these restrictions and limitations were and which physician noted them. If there is no evidence that Mr. Hintz has any documented restrictions and limitations during this time period, please indicate so.**

Based upon the medical records, Mr. Hintz has no medically documented restrictions or limitations from his physicians from the available medical records from 2004 through August 9, 2005. Additionally, there are no medically treated illnesses that would warrant restrictions and limitations cited during this time period.

**4. Please specify what Mr. Hintz received medical treatment for specifically in the six months leading up to August 9, 2005. Is there evidence supporting that his cardiac symptoms had worsened during that time period? If so, please be specific and also provide your opinion as to any appropriate restrictions/limitations in functioning that might apply.**

Mr. Hintz's last visit to his cardiologist, prior to his work cessation, was on 1/6/05. At that time, he was seen for a scheduled "yearly followup," with no particular cardiac complaints. He did state that he had fallen several weeks before and had a calf hematoma. He did undergo bilateral lower extremity vascular studies, which were within acceptable limits. He had mild ankle discomfort that required no further evaluation. It was stated that he had a right fem-pop bypass surgery in March of 2004, but in reality the vascular surgery records indicate that this is a right popliteal-peroneal bypass (lower portion of the extremity, not upper portion of the extremity). Specifically, this note indicates no chest pain or dyspnea on exertion, with a normal Dobutamine stress test completed in December 2004. He was recommended to continue increasing his exercise and lose weight.

On 5/25/05, Mr. Hintz was seen by his primary care physician for a routine history and physical with medication refills. He was also seen by his vascular surgeon on 6/28/05, for followup of the right popliteal-peroneal graft. At that time, he stated he could walk one and one-half miles, but did report some foot discomfort that was questionably Neuropathy. The last visit indicated prior to work cessation was on 7/6/05, with his primary care physician, for a diagnosis of Sinusitis that was treated with nasal steroids and oral antibiotics. During the seven months prior to cessation of employment, there were no specific cardiac treated symptoms, illness, or significant changes in therapy.

**5. If medical records are indicating significant impairment, please comment on expected treatment, duration and prognosis (Is improvement likely?).**

The medical records indicate no significant impairment from a cardiac point of view. Future treatment dictates that Mr. Hintz aggressively treat his sleep

disorder (diagnosed with severe obstructive sleep apnea that is untreated). Untreated sleep apnea affects every organ in the body and results in fatigue, fluid retention, eventual heart failure, and multiple other organ dysfunction, as well as poor endurance, poor exercise, sleepiness, neurologic symptoms, etc. Treatment of his chronic underlying illness will be for lifetime [sic] and, at this point in time, he appears to have a good prognosis.

PRU 686-87.[15]

On December 27, 2006, Prudential again contacted Kathy Lucia. Prudential's notes of the telephone conversation indicate that Lucia said that she found nothing in Hintz's human resources file to indicate "that anything came through HR regarding work accommodations and restrictions." PRU 339. Lucia further stated that she "spoke to clmts [sic] prior boss who no longer works for the company." *Id.* The former boss, who is not identified by name,[16] "advised her that he was not aware of any restrictions/accommodations requested by the clmt [sic] or his physicians either[.]" *Id.* Hintz disputes this and submitted a letter from John Ahrendt, a former Vice-President of Human Resources through June 2005, which states that Hintz "was working under medical restrictions up until his involuntary termination." PRU 463.

By December 27, 2005, Prudential was ready to uphold the denial of benefits. Def. SOF ¶ 50. Before sending out the letter, however, counsel for Hintz submitted approximately 250 pages of medical information. Prudential, upon receiving the information, observed that "it does appear that [the] medical info was submitted for the period 2003-2004 which we did not have in file, as well as updated medical from 4/06-10/06 which we also did not have in file." PRU 313. The information was forwarded to Dr. Zwicke for a review and to prepare an addendum to her

---

[15] Plaintiff argues that Zwicke's analysis was "deficient" because "she failed to examine Plaintiff and her report was limited to cardiac conditions, and ignored substantial treatment notes indicating a history of uncontrolled diabetes, which put Hintz at risk for cardiac events, especially combined with hypertension and hyperlipidemia." Pl. Resp. Def. SOF ¶ 46. However, Plaintiff denies only the implications of the fact statement rather than the fact statement itself. Defendant's fact statement is therefore deemed admitted.

[16] The parties dispute the identity of the "former boss."

initial report. Def. SOF ¶ 52. On January 22, 2007, Zwicke provided the addendum to her December 2006 report. Def. SOF ¶ 53.

Dr. Zwicke's addendum summarized the additional documents that she received:

- Forty-four outpatient office visits including: Primary Care Physician, Paul Wilson, M.D.; Primary Care Physician, Lynette Smith Callouet [sic], M.D.; Surgical Clinic, Royce Larson, M.D.; Cardiology Clinic, Malec A. Mokraoui, M.D.; Vascular Surgery Clinic, unidentifiable physician name; Sleep Medicine Clinic; Orthopedic Clinic, with unidentifiable physician name[;] Vascular Surgery Clinic, Timothy Connelly, M.D.; Cardiovascular Surgery Clinic, unidentifiable physician name; and Neurology Clinic, Charles Davies, M.D.
- Fifty contacts for diagnostic studies including laboratory reports, sleep lab reports, Dobutamine stress echocardiographic reports, lower extremity vein mapping, abdominal aortogram with run off of legs, right lower extremity surgical procedure notes, lower extremity arterial duplex, ultrasound graft surveillance reports, echocardiographic study, ultrasound of the abdomen and abdominal x-rays series.
- The only additional information provided in these records from that previously reviewed in my report of December 15, 2006, is the fact that Mr. Hintz, Jr., requested information on early retirement during his office visit with his primary care physician, on November 18, 2003. He followed this with a request from the Cardiologist (Dr. Mokraoui), with a question of 'wants to know medical requirements for long-term disability," at the time of his annual visit on December 15, 2003. These requests were made despite the fact that there was no substantive medical data in either of these clinic notes to warrant medical retirement or medical long-term disability.

PRU 472-74. Dr. Zwicke stated that the review of the additional records provided by counsel for Plaintiff did not alter the analysis of the December 2006 report. (Plaintiff states that Zwicke again "ignored substantial treatment notes" but instead of citing the critical, ignored notes, Plaintiff cites Zwicke's December 2006 report itself. See Pl. Resp. Def. SOF ¶ 53.)

On January 25, 2007, Prudential notified Hintz's counsel that its initial determination had been upheld. Def. SOF ¶ 54. The letter stated that the available medical evidence did not support that Hintz was functionally impaired from performing the material and substantial duties of his regular, "sedentary" occupation at the time of his termination. Pl. SOF ¶ 61.

On July 20, 2007, Hintz submitted a second request for reconsideration which, after referral to another reviewing cardiologist, was denied. Pl. SOF ¶ 63; Def. SOF ¶¶ 56-60. As part of the appeal, counsel for Hintz submitted a letter written by John Ahrendt, Vice President of Human Resources for CCL Custom Mfg., Inc., from January 1988 through June 27, 2005. PRU 461-64. Mr. Ahrendt stated:

> The CLL management viewed Hintz [sic] role with IT as critical, which contributed to CCL's decision to grant on-going accommodations to Hintz as he battled continuing complications from heart surgery and diabetes. Such accommodations included reduced hours, time off for physical therapy and rest, opportunity to work from home, reduced travel and business meeting participation and concessions in work dress to accommodate recovery from surgeries and therapy.
>
> While Hintz did perform work in 2004 and 2005, he missed substantial work time due to his medical conditions and was working under medical restrictions up until his involuntary termination.

PRU 462-63.

The reviewing cardiologist, Dr. Zobl, did not conclude that Hintz had functional impairments "in terms of Mr. Hintz's ability to sit, stand, walk, reach, lift, carry, and perform repetitive upper extremities activities, etc. * * * as of August 9, 2005." PRU 450. Zobl stated that "[t]here may be some restrictions on his free lifting, but in my opinion there would be no restriction on his lifting up to 25-30 pounds, which would be permanent." *Id.* However, Zobl did find evidence that Hintz's condition had worsened in the six months prior to his termination of employment: "He began having anginal episodes [in the six months leading up to August 9, 2005], and this culminated in a heart catheterization on March 21, 2006, which required stenting of an occluded circumflexed artery branch." PRU 450. After considering the stenting procedure that occurred after Hintz's employment was terminated, Zoble concluded: "I do not believe that [Hintz] is a candidate for any heavy physical exertion, but he is a candidate for regular exercise.

I think he can easily and successfully manage an occupation which does not require any excessive physical exertion and lifting up to 25 to 30 pounds." PRU 451.

Prudential notified Hintz on August 30, 2007, that it denied Hintz's appeal. The letter is a little more than four pages long and notes, with regard to the letters provided by Hintz's supervisor and co-workers that discussed workplace accommodations, that Hintz's submissions did not follow the "normal protocol." Def. SOF ¶ 61. Prudential repeated its conclusion that Hintz was not medically disabled from performing the duties of his regular sedentary occupation. Pl. SOF ¶ 65.

On January 17, 2008 counsel for Plaintiff submitted an additional letter to substantiate Hintz's claim that substantial workplace accommodations were made on his behalf. The letter was written by Janis M. Wade, Senior Vice President, Human Resources and Corporate Communications at CCL Industries, Inc. In pertinent part, Wade's letter states: "I can confirm that [Hintz] suffered from medical issues resulting in heart surgery and I was informed that he continued to have health problems during his employment. It is my understanding that CCL Custom Manufacturing's management tried to accommodate Mr. Hintz's health restrictions." PRU 392-93. Prudential responded to the letter by stating that Hintz had completed all available appeals and that no further appeals were available. Pl. SOF ¶ 71; Def. SOF ¶ 65.

E.      Hintz's Social Security Benefits

Contemporaneously with his ERISA claim, Hintz filed a claim for Social Security disability benefits. The Social Security Administration approved Hintz's application in October 2006, after reviewing notes from Drs. Smith-Caillouet, Mokraoui and Connelly. The Administration determined that Hintz met the definition of disabled for purposes of the Social Security Act and that he was disabled since August 8, 2005. Pl. SOF ¶ 29. Among the

Administrative Law Judge's conclusions were that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are not jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566)."  [1-3, at 5].

### III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Where, as here, cross motions for summary judgment are involved, the Court "look[s] to the burden or proof that each party would bear on an issue of trial; [the Court] then require[s] that party to go beyond the pleadings and establish a genuine issue of material fact."  *Diaz*, 499 F.3d at 643 (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).  At trial, "the plaintiffs would bear the burden of proving the ERISA beneficiary's entitlement to * * * benefits * * * and the defendant insurer would bear the burden of establishing the beneficiary's lack of entitlement."  *Id.* (alterations incorporated).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of

establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

ERISA at summary judgment works like any other case at summary judgment: if there is doubt about whether there is a genuine issue of material fact, "the summary judgment motion must fail." *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1096 (7th Cir. 1994).

## IV. ERISA

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 499 U.S. 101, 113 (1989)). Under ERISA, a person who is denied benefits under an employee benefit plan, has "the right to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008); 29 U.S.C. § 1132(a)(1)(B).

The Court will review a decision denying benefits *de novo* unless the plan gives the administrator clear discretion to construe policy terms and the eligibility for benefits. See *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A court may, however, apply the more deferential arbitrary and capricious standard if the plan documents give "the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. 2350-2351 (2008). The parties agree that the *de novo* standard applies to this case, which by itself ends the analysis of the proper standard. *Krolnik*, 570 F.3d at 842 ("people are free to accept the *Firestone* standard, which is ERISA's norm").

When the *de novo* standard applies, the questions related to the quality of decisionmaking that enter into the arbitrary-and-capricious analysis fall out of the case. *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 485-86 (7th Cir. 2007) (quoting *Uddeholm*, 32 F.3d at 1099). The question for the Court is only whether the claimant was entitled to benefits. *Diaz*, 499 F.3d at 643. That inquiry implicates questions of contract interpretation, which are matters of law, and questions related to historical facts, which lie in the fact finder's domain. See *id.* (stating that the district court "can and must come to an independent decision" on these legal and factual issues).

## IV.     Analysis

Prudential argues in its motion for summary judgment [62] that (i) Hintz cannot demonstrate that he was disabled on August 8, 2005 and (ii) Hintz waived his ERISA claim when he signed a release with KIK as part of the Separation Agreement that Hintz signed upon termination. As for Hintz's arguments, Prudential says that Hintz filed a "smoke screen brief * * * aimed at confusing and clouding the clear issue at bar, desperate to distract this Court's attention away from the only possible resolution of this case: Summary Judgment in favor of Prudential." Def. Mem. at 1.

Hintz, of course, conceives of a different resolution. In his motion for summary judgment [54], Hintz argues that Prudential's denial of benefits was unreasonable (the arbitrary and capricious inquiry).[17]

## A. Genuine Issues of Material Fact Surround Hintz's Disability Status

### 1. Prudential's evidence that Hintz was not disabled as of August 8, 2005

According to Prudential, Plaintiff cannot show that he would not have returned to another successful day at work on August 9, 2005, the day after he was terminated. This, asserts Prudential, is fatal to Hintz's case. Def. Mem. at 5-6. Defendant further notes that Hintz began looking for new work after his employment was terminated and that he was "hunting" for new work in 2006 before his diagnosis with congestive heart failure. *Id.* at 6; see also PRU 571. Defendant further points to Dr. Smith-Caillouet's notes in March 6, 2006, where—after Hintz's diagnosis with congestive heart failure—the doctor stated that she "did not think [Hintz] was disabled but will see what Dr. Mokraoui says." Def. Mem. at 7 (citing PRU 237). Moreover, the medical records that Hintz cites do not contain specific statements of functional impairments. See, *e.g.*, Def. Reply at 4.

Defendant points to further record evidence from which a finder of fact could conclude that Hintz was not disabled on August 8, 2005. A finder of fact could conclude that Mr. Hintz suffered from a variety of discrete ailments, each one of which was controlled through medical care. For example, when Hintz visited Dr. Mokraoui in December 2003, the doctor observed that Hintz was "a pleasant gentleman in no obvious distress" whose "blood pressure, diabetes, and lipid profile are under control." PRU 495. The notes encouraged Hintz to engage in greater physical activity (while cutting down on travelling for work). *Id.* at 495-96. And while Hintz

---

[17] Hintz clarifies in his reply brief that he was merely pointing out all of the evidence that Prudential failed to consider and that consideration of all of the evidence can lead only to a judgment in his favor. Pl. Reply at 1.

was seen in October 2004 for rib discomfort, subsequently diagnosed as costochondritis (an inflammation of cartilage that connects a rib to the breastbone), there is no mention of the condition after October 15, 2005. See PRU 524, 526; Pl. SOF ¶ 42 & n.16. A similar course of events occurred with respect to Hintz's fall from a stepladder at the end of October of 2004. See PRU 526. Although subsequent exams revealed skin discoloration and a hematoma secondary to contusion (see PRU 530, 533), an exam roughly two weeks after the fall noted that the skin discoloration was beginning to lighten and the associated swelling was down (PRU 538) after which the leg injury is not heard from again.

Finally, at the end of June 2005 (roughly one and a half months before Hintz's position was terminated), Hintz was seen for an arterial Doppler study and then was seen by Dr. Connelly about one week later. See PRU 124, 621. While the study revealed an absence of Doppler signals in two arteries and the doctor who performed the study presumed the arteries to be obstructed (PRU 621), Dr. Connelly stated that Hintz's Doppler studies were "basically unchanged" and that Hintz "can walk about a mile and a half without difficulty and overall is doing well." PRU 124. In sum, Prudential argues, citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), that Prudential "can and did properly rely on Drs. Zwicke and Zobl's opinion [that Hintz was not disabled] over Dr. Mokraoui's opinion in favor of disability." Def. Mem. at 10.

The problem for Prudential, in the end, is that the propriety of Prudential's determination simply is not a part of this case. *Nord* was an abuse of discretion case in which the Court held that a Plan need not accord special deference to an insured's treating physician. 538 U.S at 825-26. The question in a *de novo* case is whether Hintz was entitled to benefits. For Prudential, that means that it must show that Hintz is not entitled to benefits in order to prevail at summary

judgment. *Diaz*, 499 F.3d at 643. For Hintz, that means that he must show that he was entitled to benefits in order to prevail at summary judgment. *Id.* The evidence cited above that Prudential has mustered unquestionably is sufficient to stave off Hintz's motion for summary judgment. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577-78 (7th Cir. 2006) (holding, in an abuse of discretion ERISA case, that it was rational to rely on a brief expert report based on file reviews in concluding that a claimant was not disabled)[18]; *Semien v. Life Ins. Co.*, 436 F.3d 805, 812 (7th Cir. 2006) (two physician reports, coupled with an analysis based on the reports, "provide[d] a sufficient basis and rational support for the conclusion that [the insured] was ineligible" for benefits); see also *Abdullah v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (observing that "even brief expert reports will suffice at the summary judgment stage"); *Vollmert v. Wisc. Dept. of Transp.*, 197 F.3d 293, 301 (7th Cir. 1999) (experts need not provide a "primer on why the facts allow the expert to reach [her] conclusion" in order to survive summary judgment).

The question, therefore, is whether Hintz sufficiently has shown that there is a genuine issue of material fact about Hintz's disability status. If not, given that Prudential has already supported its denial of benefits with evidence from which a finder of fact could conclude that Hintz was not disabled, then Prudential's summary judgment motion must be granted. If, however, Hintz offers evidence that creates a genuine issue of material fact about Hintz's disability status, then both motions must be denied.

### 2. Hintz's evidence that he was disabled as of August 8, 2005

---

[18] In *Davis*, the Seventh Circuit noted multiple times that (unlike a *de novo* case) the task for the Court was to determine only whether the decision was reasonable, not whether the Plan's decision was correct. 444 F.3d at 578.

The Court concludes that there are genuine issues of material fact surrounding Hintz's disability status and that the parties' cross-motions for summary judgment therefore must be denied.

The policy provides that an insured is disabled if he or she is "unable to perform the material and substantial duties of [the person's] regular occupation due to sickness or injury." Regular occupation means "the occupation that [the insured is] routinely performing when" the insured's disability begins. PRU 11. Sickness means "any disorder of [the insured's] body or mind, but not an injury." *Id.* Material and substantial duties means duties that "are normally required for the performance of your regular occupation" and which "cannot be reasonably omitted or modified * * *."[19] *Id.* The policy distinguishes between that which must be proved (disability) and the method by which a claimant may prove disability. In order to prove an insured's disabling condition, the insured must provide "[a]ppropriate documentation of the disabling disorder" and "the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation." PRU 23. That provision means—as the Seventh Circuit recently stated in a case to which Prudential was a party that involved the exact same legal issue and the identical policy language—that Hintz can offer evidence even if it is not "medical" evidence. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 645 (7th Cir. 2005). In *Diaz*, that meant considering the evidence that the insured submitted which included Diaz's "own testimony and behavior; the assessments of his condition and treatments ordered by the physicians who treated him; and the diagnostic tests performed by his physical therapist." *Id.*

_____

[19] The Court notes that the parties dispute the amount of activity required of Plaintiff's job. See Pl. Resp. Def. SOF ¶ 35. As discussed below, however, Dr. Mokraoui seems to state that Hintz should not have been working at all prior to August 8, 2005.

There are three classes of evidence that create a genuine issue of material fact in this case: the observations of co-workers, the opinion of Dr. Mokraoui, and Hintz's successful application for social security benefits.

Several co-workers submitted letters to Prudential regarding Hintz's functional impairments. The letters from coworkers state, among other things, that Hintz was having difficulty meeting the physical demands and stress of his job (PRU 118), that Hintz had a "chronic cough" that would disrupt conference calls and conversations (PRU 119, 120), experienced difficulty speaking (PRU 120, 121), could not finish meals (PRU 121), could not unload his vehicle or otherwise lift small items without getting tired (*id.*), and that Hintz was working under medical restrictions (PRU 462-63). Prudential stated that letters from co-workers were not part of the "normal protocol" for establishing medical restrictions. Def. SOF ¶ 61. But as noted above, that protocol does not appear to arise by contract, so even if the evidence did not bear on Prudential's analysis it must enter into the Court's analysis. Prudential could have deposed these witnesses to pin down their testimony, perhaps eliminating fact issues (see, *e.g.*, *Krolnik*, 577 F.3d at 843), but did not do so.

Prudential argues that "there is * * * no reason to give more credence to the statements of disgruntled[20] employees terminated from CCL in 2005 than to the objective content of Plaintiff's employment file * * *." Def. Mem. at 7. Defendant is correct, but at summary judgment in a *de novo* case the point is that the Court cannot lend more credence to Prudential's evidence either. And as discussed above, the Policy limits Hintz to "appropriate" evidence, not merely medical evidence. See also *Hawkins v. First Union Corp. Long-Term Disability Plan*,

---

[20] Prudential does not point to record evidence that supports the conclusion that the employees were disgruntled.

326 F.3d 914, 917 (7th Cir. 2003) (indicating that a plan may specify the procedures and rules of evidence that a plan's administrator shall use to evaluate claims).

The report of co-worker observations of Hintz do not stand alone: critically, Hintz also included statements from Dr. Mokraoui that Hintz was disabled by August 8, 2005. See PRU 282-83, 114-15. Prudential is correct that a conclusory report from an expert will not bar summary judgment. *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). Metaphysical doubt is metaphysical doubt even when it comes in expert's clothing. Had Hintz submitted only Mokraoui's attending physician's statement, then the report would be entitled to no weight because it provides no elaboration of Mokraoui's findings. In contrast, the October 2006 letter from Mokraoui provides a more extensive description of Mokraoui's analysis and conclusions. The letter is approximately two pages long, points out what he believed to be flaws in Prudential's analysis, stated that Hintz was functionally impaired, and stated that "Hintz should have stopped working after [his] second revascularization" in April 2004 and possibly after his coronary bypass in 1998. PRU 115. Mokraoui further stated that the need to use Dobutamine (chemical based) stress tests rather than treadmill stress tests is "not a good prognostic sign." *Id.* Because a conclusion by an expert that is supported by only a brief description will prove sufficient to survive summary judgment (*Abdullah*, 423 F.3d at 772), Hintz has shown that there is a disputed fact issue regarding his disability status. The analysis does not change in light of Prudential's argument that if Hintz was able to soldier on with accommodations, then he was not disabled. Although the language of the policy states that material and substantial duties are those which cannot be met with reasonable accommodations (PRU 23), the argument fails for at least three reasons: (1) what Hintz's duties entailed is disputed (see Pl. Resp. Def. SOF ¶ 35); (2) the mere fact of accommodations does not foreclose the possibility that the company went beyond

what was reasonable (and the parties hotly contest whether accommodations were made at all); and most importantly, (3) the Seventh Circuit has held that continuing to work (even without accommodations) does not bar an insured from establishing that she is entitled to benefits (see *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)). In *Hawkins*, Judge Posner reiterated that there is no logical incompatibility between working full time and being disabled from working full time. "[E]ven a desperate person might not be able to maintain the necessary level of effort indefinitely. * * * A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability." *Id.*[21] Although Prudential's brief asserts that Hintz is not such a person, Mokraoui's letter says otherwise.

Indeed, the pertinent facts in this case run parallel to the facts in *Patton*, where Judge Cudahy's opinion for the court of appeals held that there was a fact issue that precluded summary judgment where a "naked assertion[]" in a letter by a doctor in an ERISA case was bolstered by a more "comparatively detailed" diagnosis. 480 F.3d at 487 (further reasoning that discrepancies between the two documents did not alter the analysis because the overall picture presented a "coherent opinion that [the plaintiff's injury left] him unable to" work). It is for the fact finder to evaluate other aspects of the letter, such as the fact that the letter was written after the claims process began, the detail in the letter, and so forth. See *id.* at 487-88. Finally, Prudential argues that Hintz cannot show that he was disabled because none of the medical records contain functional impairments. Prudential has not presented authority that says actual "medical" notes of functional impairments are required to survive summary judgment, *Diaz* forecloses the argument (499 F.3d at 645), and Prudential itself concluded that Hintz was

---

[21] Therefore, the pertinent inquiry is not, as Prudential asserts, whether Hintz would have showed up to work on August 9, 2005, but whether under *Hawkins* he could have chosen to stay home.

"possibly" disabled in November 2005 (PRU 378) despite the absence of functional impairment notes that Prudential complains about.

The third type of evidence that Hintz has included is his favorable Social Security Administration determination. [See 1-3]. Prudential argues both that it was not unreasonable "to not defer to the SSA's determination" (an argument based on the inapplicable arbitrary and capricious standard) and that the Administration's determination actually supports Prudential's position because the former concluded that Hintz continued to have residual sedentary capacity * * *." Def. Mem. at 9. As the Court repeatedly has noted in this opinion, the reasonableness of Prudential's determination is not a part of this case, at least not in the case's current procedural posture. And as to the argument that Social Security Administration's determination supports Prudential's position, both parties will have the opportunity to say more as the case progresses— the disputed issues surrounding Hintz's job duties prevent meaningful evaluation of the Social Security decision's bearing on this case.

The Seventh Circuit teaches that Social Security decisions "are instructive" though "not dispositive" in ERISA cases. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004). The extent to which a Social Security decision applies to a case may be fact specific. See *id.* at 1047; *Krolnik*, 570 F.3d at 844 (district court should compare terms of plan terms with Social Security rules). Here the pertinent policy language states that a person is disabled when unable to perform the material and substantial duties of that person's regular occupation and experience a 20% or more loss in indexed monthly earnings. The Social Security regulations in this realm are voluminous (see 20 C.F.R. § 404.1520 for a starting point), and Plaintiff fails to cite to the pertinent regulations that further his case. The Administrative Law Judge handling Hintz's case did conclude that Hintz was unable to perform "any substantial

gainful activity," although the ALJ also concluded that Hintz had "residual functional capacity to perform work that requires the ability to lift and carry up to 10 pounds occasionally, to stand and walk occasionally and to sit and work for most of the day." [1-3]. Because Plaintiff's work duties are disputed, it is impossible to determine how much weight the Social Security decision should be given.

Where a factual record supports competing inferences, it is for a fact finder rather than for a court at summary judgment "to weigh all the evidence and choose between competing inferences." *Abdullah*, 423 F.3d at 770. The relevant Seventh Circuit case law, as well as the general principles regarding summary judgment, foreclose the possibility of resolving the issues in this case without a trial.

**B.      The Separation Agreement**

Prudential argues near the end of its memorandum of law that the Separation Agreement (the "Agreement") that Hintz signed on the date that his employment terminated bars his right to long term disability coverage. See, *e.g.*, Def. Mem. at 14. Plaintiff asserts a number of defenses. In general, an employee may waive her right to file suit against an employer for federal civil rights claims. *Pierce v. Atchison, Topeka, and Santa Fe Ry. Co.*, 65 F.3d 562, 571-72 (7th Cir. 1995). Here, the Agreement is being asserted as an affirmative defense, and because Prudential bears the burden of proof at trial in establishing the defense, it must "identify evidence that would permit a jury to find in [its] favor." *Roberts v. Broski*, 186 F.3d 990, 995 (7th Cir. 1999); see also 11 MOORE'S FEDERAL PRACTICE § 56.11[1][a].

The text of the Agreement is set out in full below, although the Court has highlighted the portions that are most important to the discussion:

4.      General Release of Claims and Promise Not to Sue.   ***In return for Employer's promises in this Agreement***, including Employer's promise in

Paragraph 2 to pay Employee the full remaining amount of the Severance Period, **Employee** on behalf of himself and his heirs, successors, and assigns, to the maximum extent permitted by law, hereby **releases** and forever discharges and **promises not to sue Employer**, its parent, subsidiary, other affiliated entities, and all of its owners, shareholders, directors, officers, employees, agents, **and employee benefit plans** of such entitites (collectively "Releasees") from or **for any and all claims**, debts, **and causes of action of every kind and character** whatever (including attorneys' fees and costs) known or unknown **which Employee has** against such entities **as of the execution of this Agreement**, including without limitation claims of wrongful discharge, retaliation, breach of express or implied contract, fraud, misrepresentation, defamation, or liability in tort, claims of any kind that may be brought in any court or administrative agency, **including without limitation claims under** Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, **the Employee Retirement Income Security Act**, the Family and Medical Leave Act, and similar state or local statutes, ordinances, and regulations.

PRU 273 (emphasis added).

Prudential argues that the language of the Agreement cuts off Hintz's right to insurance coverage though not his right to sue. Prudential has done little to explain its construction of the Agreement, which appears to defy its plain language,[22] and offers a scant three sentences in reply

---

[22] Prudential's interpretation of the Agreement – that it bars not the right to sue but the right to file claims – is hardly obvious, particularly given that the Agreement speaks in no uncertain terms about the right to sue. A more interesting argument, one not made by Prudential, is that the Agreement cuts off only Hintz's right to sue if benefits are denied—not his right to file an ERISA claim. Whether that interpretation is viable depends on the meaning of the word "claim," as well as that word's interaction with "releases." If "claim" is given the same meaning as "cause of action," then Prudential's effort to assert the Agreement is probably a loser because a cause of action under 29 U.S.C. § 1132(a)(1)(B) does not accrue until benefits have been denied by the fiduciary. See, *e.g.*, *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996). "[E]ven a general release will not be construed to bar the enforcement of a claim that had not accrued as of the date of the release." 29 WILLISTON ON CONTRACTS § 73.10 at 31 (4th ed. 2003); see also *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628, 635 (W.D. Wis. 2009) (underpayment of ERISA pension benefits which occurred after releases were signed constituted future injuries outside the scope of the release). Hintz did not have a cause of action until his benefits were denied, after his employment was terminated.

The result could be different if "claim" refers to claims filed with an ERISA plan. Then the Agreement could be read as barring only suits on claims that could have been filed with ERISA plan on the date of termination, or it could be read as barring both claims before an ERISA plan and a person's right to sue. To be sure, the ambiguity in the Agreement on this score might run up against the rule that a contract is construed against its drafter. See, *e.g.*, *Nelson v. Ipalco Enters., Inc.*, 2005 WL 1924332, at *5 (S.D. Ind. 2005); *Duldulao v. Saint Mary of Nazareth Hosp.*, 505 N.E.2d 314, 319 (Ill. 1987)

to Hintz's estoppel argument (in which Prudential cites no law). The Court denies Defendant's motion for summary judgment based on the Separation Agreement so that the parties are afforded the opportunity to give more meaningful attention to the complex issues related to the Agreement and possible defenses, including Hintz's argument that the waiver was not knowing and voluntary. See *Pierce*, 65 F.3d at 570-71 (totality of the circumstances framework); *Am. Auto Guardian, Inc. v. Acuity Mut. Ins. Co.*, 548 F. Supp. 2d 624, 631-32 (N.D. Ill. 2008) (denying summary judgment where argument in support of motion was "underdeveloped").

### C. Remaining Issues

The disposition of the parties' cross motions for summary judgment makes it unnecessary for the Court to decide several other issues that were addressed in the parties' briefs: (i) whether Hintz's eligibility for benefits should be capped based on the self-reported symptoms limitation in the Policy, (ii) the appropriate remedy in the event Hintz succeeds, and (iii) attorneys' fees and prejudgment interest.

## V. Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment [54, 62] are denied.

Dated: September 28, 2009

_____
Robert M. Dow, Jr.
United States District Judge

---

("Ambiguous contractual language is generally construed against the drafter of the language."). Neither party, however, has presented argument about the construction of the Agreement.